# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00148-CV

### J. M., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 20TH DISTRICT COURT OF MILAM COUNTY
### NO. CV41264, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant J.M. (Mother) appeals from the district court's order, following a jury trial, terminating her parental rights to her daughter B.T. ("Beth"), who was born June 28, 2021.[1] In two issues on appeal, Mother asserts that the district court lost jurisdiction over the case before it entered its order terminating her rights and that the evidence presented at trial was not legally and factually sufficient to establish by clear and convincing evidence that termination of the parent-child relationship between Mother and Beth was in Beth's best interest. We will affirm the termination order.

---

[1] For the child's privacy, we refer to her using a pseudonym and to her parents and other relatives by their familial relationships to each other. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

# BACKGROUND

In February 2022, the Texas Department of Family and Protective Services (the Department) filed its petition seeking termination of the parental rights of Mother and the alleged father of Beth, D.T. (Father). According to the removal affidavit, a copy of which was not admitted into evidence but has been included in the clerk's record, the Department received a referral in July 2021 alleging that Father had a history of sexually abusing children, that Father and Mother had been engaging in substance abuse of methamphetamine and alcohol, and that the substance abuse had taken place throughout Mother's pregnancy with Beth. On February 11, 2022, while the Department's investigation was ongoing, Father was arrested for driving while intoxicated. At the time of the incident, Beth was in the vehicle with Father, and Mother had allowed Beth to be in Father's care despite knowing that Father "had returned to regular consumption of alcohol." This incident prompted the Department to file its petition for termination and seek emergency removal of Beth from Mother's and Father's care. The district court granted the request for removal, and on February 14, 2022, the district court appointed the Department temporary managing conservator of Beth.

Two years later, in February 2024, the case proceeded to a jury trial on the issue of the termination of Mother's parental rights.[2] Witnesses at trial included Mother; Department caseworkers Belinda Torrey, Lara Sears, and Bruce Jacoby; Kim Dodd, a CPS family group decision-making specialist; Beth's foster parents; and Dr. James Shinder, who conducted a psychological evaluation of Mother. We discuss this evidence in more detail below.

---

[2] In 2023, Father executed a voluntary relinquishment of his parental rights to Beth. He is not a party to this appeal.

At the conclusion of trial, the jury found by clear and convincing evidence that Mother had: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The jury further found by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest. *See id.* § 161.001(b)(2). In accordance with the jury's verdict, the district court ordered Mother's parental rights to Beth terminated. The district court entered its order on February 28, 2024. This appeal followed.

## DISCUSSION

### Jurisdiction

In her first issue, Mother contends that the district court's order terminating her parental rights is void because the district court lost jurisdiction over the case before it entered the order. We disagree.

In cases where the Department requests termination of parental rights or conservatorship of a child, section 263.401(a) of the Family Code provides:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order.

3

Tex. Fam. Code § 263.401(a). "[A] trial court's failure to timely extend the automatic dismissal date before that date passes—through a docket-sheet notation or otherwise—is jurisdictional . . . ." *In re G.X.H.*, 627 S.W.3d 288, 301 (Tex. 2021). Thus, any orders in the case entered after the dismissal date are void. *Id.* at 296.

A trial court may retain a suit on its docket beyond the one-year deadline in either of two ways. First, under subsection 263.401(b), if no trial has commenced, "the court may retain the suit on the court's docket for a period not to exceed 180 days" after the automatic dismissal date if "the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the [D]epartment as temporary managing conservator is in the best interest of the child." Tex. Fam. Code § 263.401(b). "If the court makes such findings, it must render an order scheduling a new dismissal date no later than 180 days after the initial dismissal date, making 'further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit,' and setting the case for a trial on the merits no later than the new dismissal date." *C.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00383-CV, 2023 WL 3027468, at *4 (Tex. App.—Austin Apr. 21, 2023, no pet.) (mem. op.) (quoting Tex. Fam. Code § 263.401(b)).

Second, under subsection 263.401(b-1), "if the court commences trial before the dismissal date—whether the initial one-year dismissal or a date extended under subsection (b)—and then either grants a motion for new trial or mistrial, the court 'shall retain the suit' on its docket and render an order scheduling a new automatic dismissal date no later than 180 days after the date the motion for a new trial or mistrial is granted." *Id.* (quoting Tex. Fam. Code § 263.401(b-1)). "As under subsection (b), the order must also make 'further temporary orders

4

for the safety and welfare of the child as necessary to avoid further delay in resolving the suit' and must set the case for a new trial on the merits by the extended dismissal date." *Id*. (quoting Tex. Fam. Code § 263.401(b-1)).

If a trial court grants an extension under either subsection (b) or (b-1) "but does not commence the trial on the merits before the [new] dismissal date, the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order." Tex. Fam. Code § 263.401(c). Moreover, "[t]he court may not grant an additional extension that extends the suit beyond the required date for dismissal under Subsection (b) or (b-1), as applicable." *Id*. This Court has held that section 263.401 "does not authorize multiple extensions under either subsection" and that "to the extent that section 263.401 can be read as authorizing more than one extension, it authorizes at most one extension under subsection (b) and one extension under subsection (b-1) if the requirements for those provisions are met." *In re G. P.*, 665 S.W.3d 127, 133 (Tex. App.—Austin 2023, orig. proceeding). "The parties to a suit under this chapter may not extend the deadlines set by the court under this subchapter by agreement or otherwise." Tex. Fam. Code § 263.402.

In this case, the district court rendered its temporary order appointing the Department as temporary managing conservator on February 14, 2022. Thus, the automatic dismissal date was February 20, 2023, "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." *See id*. § 263.401(a). On February 3, 2023, the district court held a status hearing at which it announced that "we put this [case] on the docket to get the extension done." Although no evidence or argument was presented during the hearing, the district court made the required findings for an extension on the record:

5

> Okay, the Court finds that extraordinary circumstances necessitate the child remaining in the Temporary Managing Conservatorship of the Department and the continuing appointment of the Department as Temporary Conservator is in the best interest of the child. All right, so I will sign off on the extension.

Mother did not object to the extension.

At the conclusion of the hearing, Father's attorney announced that Father had "expressed . . . interest in relinquishing" his parental rights, that counsel had "forwarded [Father] the paperwork," and that "we just need to put pen to paper on that unless something has changed in the last few days." The district court replied, "Sounds good. Let us know when you are ready to go. We can take that up whenever. All right, if there is nothing else, current placement will continue. The case has been extended and we will be in recess." The district court's April 14, 2023, permanency-hearing order reflects that the district court extended the dismissal date to August 14, 2023.

The record reflects that the case proceeded to a hearing on August 7, 2023, at which "all parties appeared in person and represented by counsel."[3] At the beginning of the hearing, the district court announced that "we are set for jury trial this morning but the previous few minutes I believe an agreement has been possibly worked out." Mother then took the witness stand, and the attorney ad litem for the child questioned Mother about her understanding of an agreement that had been reached between her and the Department. Mother testified that as part of the agreement, she was "waiv[ing] her right to a jury trial." Mother also testified that she understood the terms of the agreement, including that the foster family would be permanent managing conservators of Beth while Mother would be possessory conservator, that Mother's

---

[3] A reporter's record of this hearing was not originally included in the appellate record but was provided after this Court inquired as to its existence.

6

contact with and visitation of Beth would be subject to the approval of the foster parents and Mother passing drug tests, and that Mother would not live with Father or allow him to be present during her visits with Beth. Mother further testified that she understood that the terms of the agreement were to be incorporated into the district court's final order and that any violation of the final order could subject her to a private termination suit filed by the foster family.

After Mother testified, the district court asked the child's ad litem if he "agree[d] with the Court that acceptance of this agreement, in lieu of a termination trial, [was] in the child's best interest." The ad litem agreed, stating that although he believed the Department "could win at trial," it was "in the child's best interest to have an opportunity to have a meaningful relationship with her mother." The district court then "accept[ed] this agreement, finding it is in the best interest of the child to do so," named Mother "possessory conservator subject to the terms of the agreement," and ordered permanent managing conservatorship (PMC) to the foster parents. The district court then asked if "this conclude[s] the case or do we keep it open?" The Department responded that "all the parties have to sign on [the agreement] and get the foster parents to agree to it" and suggested "PMC to the Department until the last hearing" to avoid issues with the upcoming dismissal date, which was the following week, and to "keep the ad litem and keep the Department engaged." The district court stated that it "like[d] that idea," scheduled another hearing for November 3, and recessed the proceedings. No written order was entered following the August 7 hearing, although a docket-sheet entry for that date reads, "Father relinquished. Mother accepted a deal for PC," i.e., possessory conservatorship.[4]

---

[4] Also on August 7, Father signed an affidavit voluntarily relinquishing his parental rights to Beth. The only order in the record relating to the August 7, 2023 hearing is an "interlocutory order terminating the parent-child relationship" between Father and Beth, based on Father's executing an affidavit voluntarily relinquishing his parental rights to the child. *See*

7

On November 7, 2023, the ad litem filed what was labeled an "agreed motion for new trial." In the motion, the ad litem represented that a judgment had been signed by the district court on August 7, that "the parties did not agree on a settlement, although the Court believed at the time that they had agreed," that this "error probably caused rendition of an improper judgment in the case," and that the "granting of a new trial would not injure any parties in this case."[5] On November 17, 2023, the district court granted the motion, and the case proceeded to a three-day jury trial on February 5, 2024, within 180 days of the date the district court granted the motion for new trial. The district court signed its order terminating Mother's parental rights on February 28, 2024.

On this record, we conclude that the district court did not lose jurisdiction over the case. The district court first extended the dismissal date under the authority of Subsection 263.401(b) to August 14, 2023. Thus, to retain jurisdiction, the district court was required to "commence the trial on the merits" by that date. *See* Tex. Fam. Code § 263.401(c) ("If the court grants an extension under Subsection (b) or (b-1) but does not commence the trial on the merits before the dismissal date, the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order.").

To determine whether "trial on the merits" "commenced" for purposes of Section 263.401, we must first define those terms as a matter of statutory construction. "When construing a statute, our primary objective is to ascertain and give effect to the Legislature's

---

Tex. Fam. Code § 161.001(b)(1)(K). The district court signed the order on February 14, 2024. The order does not address Mother's parental rights or the possessory conservatorship of Beth.

[5] At a status hearing held in November 2023, before the new trial was granted, the parties explained that there had been "a miscommunication" and that the terms of the agreement were not acceptable to the foster placement.

intent." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). "To discern that intent, we begin with the statute's words." *Id*. "If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage." *Id*. "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *Id*.

"Commence" is not defined in the Family Code, but the term's ordinary meaning is to "begin" or "start." *See Commence*, *Webster's Third New Int'l Dictionary* 456 (2002); *see also In re Z.S.*, 631 S.W.3d 313, 318 (Tex. App.—Houston [14th Dist.] 2020, no pet.). "Trial on the merits," although not defined in Section 263.401, is defined elsewhere in the Family Code as "any final adjudication from which an appeal may be taken to a court of appeals." Tex. Fam. Code § 201.005(b); *see also* Black's Law Dictionary 1644 (9th ed. 2009) (defining "trial" as "[a] formal judicial examination of evidence and determination of legal claims in an adversary proceeding"); *id*. 1645 (defining "trial on the merits" as "[a] trial on the substantive issues of a case, as opposed to a motion hearing or interlocutory matter"). Other Texas courts have concluded that commencement of trial on the merits, as that term is used in Section 263.401, "requires more than a putative call of the case and an immediate recess in order to comply with the statute." *In re D.S.*, 455 S.W.3d 750, 753 (Tex. App.—Amarillo 2015, no pet.). "[A]t a minimum the parties should be called upon to make their respective announcements and the trial court should ascertain whether there are any preliminary matters to be taken up." *Id*. Factors to consider in the analysis include whether, on the alleged commencement date, any preliminary matters were addressed, the parties announced "ready," opening statements were made,

witnesses were sworn, a witness testified, and exhibits were admitted. *In re J.L.J.*, 645 S.W.3d 294, 295-96 (Tex. App.—Houston [14th Dist.] 2022, pet. denied).

The record reflects that on August 7, 2023, the case was set for a jury trial that morning and that "all parties appeared in person and represented by counsel" at that time. At the beginning of the proceedings, the district court announced that "an agreement has been possibly worked out." Mother then testified as to her understanding of that agreement, including that she was "waiv[ing] her right to a jury trial" and that the terms of the agreement were to be incorporated into the district court's final order. The district court then questioned the child's ad litem as to whether the agreement was in the best interest of the child, and the ad litem agreed that it was. At the conclusion of the proceedings, the district court "accept[ed] this agreement, finding it is in the best interest of the child to do so," named Mother "possessory conservator subject to the terms of the agreement," and ordered PMC to the foster parents and the Department. Thus, when the district court recessed the proceedings, the district court and the parties believed that an agreement on Mother's parental rights had been reached, the district court had accepted the agreement and rendered judgment on that agreement, and the only thing that remained to be done was for the parties to sign the agreement. We conclude that for purposes of Section 263.401, the district court commenced "trial on the merits," i.e., the final adjudication of Mother's parental rights to Beth, before the extended dismissal date of August 14, 2023.

The final question is whether the district court properly retained jurisdiction of the case after the district court granted a new trial. We conclude that it did. Subsection 263.401(b-1) provides in relevant part,

> If, after commencement of the initial trial on the merits within the time required by Subsection (a) or (b), the court grants a motion for a new trial . . . the court shall retain the suit on the court's docket and render an order in which the court schedules a new date on which the suit will be automatically dismissed if the new trial has not commenced, which must be a date not later than the 180th day after the date on which the motion for a new trial . . . is granted.

Tex. Fam. Code § 263.401(b-1). Here, the trial court granted the agreed motion for new trial on November 17, 2023,[6] and the new trial commenced on February 5, 2024, well within 180 days of the date the district court granted the motion for new trial. Although the record does not reflect that the district court "render[ed] an order in which the court schedules a new date on which the suit will be automatically dismissed if the new trial has not commenced," as required by Section 263.401(b-1), we conclude that this was not a jurisdictional requirement. *Cf. In re J.S.*, 670 S.W.3d 591, 603-04 (Tex. 2023) (concluding that similar requirements of Subsection 263.401(b) were mandatory but not jurisdictional). Accordingly, the district court retained jurisdiction over the case when it entered its order terminating Mother's parental rights.

We overrule Mother's first issue.

**Best interest**

In her second issue, Mother asserts that the evidence is legally and factually insufficient to prove that termination of her parental rights is in the best interest of Beth. Mother does not challenge the sufficiency of the evidence regarding the statutory grounds for termination.

---

[6] "A motion for new trial, if filed, shall be filed prior to or within thirty days after the judgment or other order complained of is signed." Tex. R. Civ. P. 329b(a). Because the district court had not signed its judgment regarding Mother's parental rights, it retained plenary power to grant the motion for new trial. *See In re Baylor Med. Ctr. at Garland*, 280 S.W.3d 227, 230 (Tex. 2008) ("Under the current rules [of civil procedure], if no judgment is signed, no plenary-power clock is ticking.").

11

*Standard of review*

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam.

Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the

13

future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

### *Evidence presented*

Mother had a history with the Department dating back to 2012 that involved her three older children, all of whom had been removed permanently from her care. Department caseworker Bruce Jacoby was assigned to an earlier case involving Mother and Father's four-year-old son, D.J. Jacoby testified that the case involved drug use and that both parents "kept testing positive for drugs," although "dad was worse than mom. Mom seemed to be able to hold off better and especially near the end she seemed to be doing better than dad was." Nevertheless, "they were working services together and when services are together you have to evaluate the entire safety of the home so we couldn't recommend the child going home at the time." Ultimately, Mother's parental rights to D.J. were terminated. Mother's parental rights to her two oldest children had also been terminated based on a finding of endangerment involving drug use.

14

Belinda Torrey was the Department caseworker assigned to the current case from February 2022, when it began, until November 2023. Torrey testified that Beth had been removed from Mother's care due to Mother's inability to protect Beth from Father, who had been arrested for driving while intoxicated with Beth inside the vehicle. According to Torrey, Mother had entrusted Beth to Father's care and gave him the keys to her truck despite knowing that Father was an alcoholic and had relapsed. Torrey also testified that at the time of his arrest, Father had tested positive for an "astronomical" level of methamphetamine, but Mother claimed that she was not aware that Father had been using drugs at the time.

Shortly after Beth was removed, Torrey met with Mother and Father and established a service plan for them. Pursuant to this plan, Mother was required to: maintain safe and stable housing; maintain eligibility for VA disability payments; pay child support of $75 monthly; maintain monthly contact with the Department; complete a drug and alcohol assessment; submit to weekly random drug testing; participate in a psychological evaluation; refrain from criminal activity and associating with criminals; attend NA, AA, or Celebrate Recovery twice weekly; and participate in individual counseling.

Torrey testified that Mother had one supervised one-hour visit per week with Beth, contingent on Mother having two consecutive negative drug-and-alcohol tests. Torrey testified that the tests were for both drugs and alcohol because of Mother's "long history of alcohol problems." Torrey believed that increasing the number of visits would jeopardize Beth's health and safety because Mother "clearly has a long history of . . . very poor judgment," particularly regarding Father, who Torrey described as "dangerous, especially to children." Torrey explained,

> The man she was currently with, who was not getting visits with the child at the time, but she insisted on staying with him, and we can go into his history if you like, insisting that she did nothing wrong even though it was her truck, her car

15

keys, and her child. She left the child with him, gave him the truck and the keys knowing that he was drinking. And with his meth results at that point, as high as they were astronomical, she didn't know, as a previous user, that he was on meth, too.

Torrey did not know if Mother and Father were still in a relationship at the time of trial because she was no longer the caseworker, but she testified that at the beginning of the case, Mother and Father lived together until he went to jail for DWI, and "[n]umerous calls, texts, visits" had occurred between Mother and Father after Father went to jail. Torrey testified that Mother continued her relationship with Father "[e]ven though I tried to explain to her for two years he was a serious problem for her to stay with him."

Torrey further testified that Mother had contacted her only once during the case, had not paid child support, was unemployed and did not have housing at the beginning of the case, and "was never forthcoming about her income." Torrey had referred Mother to parenting classes with two different providers, but Mother was unsuccessfully discharged from one provider for non-attendance, and Torrey received no documentation that she had completed classes with the other provider.

According to Torrey, Mother attended a total of three AA meetings during the case, one in August 2022 and two in October 2022, but Torrey testified that Mother should have attended approximately 75 meetings. Torrey explained that Mother's need to attend AA was based on "her past ten or twelve years of alcohol and drug abuse. She can maintain sobriety for a short period of time and then she falls off the wagon." Mother completed two drug and alcohol assessments during the case and did not qualify for services either time, but Torrey testified that qualification for services was based on "however truthful you are going to be with them." She explained, "[I]f you call them and lie that you don't have any problems and you have never tested positive for drug or alcohol, they are going to say we don't have resources for you because you don't need it."

16

Regarding Mother's drug tests, Torrey testified that the Department had "quite an extensive list" of test dates and results for Mother, including "a lot of negative drug tests," "a lot of tests that she failed to attend," and "some dilute negative drug testing," which occurs when someone "tries to flush their system with excess amounts of water or other things you can buy on the market to cleanse them of drugs and alcohol." The Department considered the dilute negative tests and the tests that Mother failed to take as positive tests. Additionally, while Torrey was on the case, Mother tested positive on multiple occasions for opiates, which J.M. reported had been prescribed to her for lower back pain, and on two occasions for alcohol, once at a "high level" and once at a "relatively low" level. Before testifying, Torrey had also looked at Mother's more recent drug-test results and found that Mother did not test in November or December 2023 but tested positive for alcohol in January 2024. When asked if Mother had "maintained sobriety" from drugs throughout the case, Torrey testified, "That's questionable, because we had so many missed tests I can't say that. Yeah, I can prove, there is a long period of time, yeah, she was negative. But there is a lot of not testing and other problems too." Torrey also testified that Mother's test results when she was living with Father were "questionable":

> Here is how I look at things with couples living together, she didn't test one day but then went the next. But when I look at his test, his meth tests are off the charts, and living at the same house and she is claiming that she doesn't know he is high on that meth and she is skipping some of her tests. That's questionable.

Kim Dodd, a family group decision-making specialist for CPS, arranged a meeting with Mother and Father in September 2022 to discuss their progress in the case. Dodd testified that she had Mother and Father come up with a list of goals that they needed to accomplish to address the Department's concerns. Mother listed her goals as "continue counseling with none missed"; "continue drug testing as scheduled"; find a one-bedroom apartment that she would not share with

17

Father or Father's mother, who lived with Father and had a history of abusing him; make decisions as if Beth were living with her, and "cut ties with [Father] until he shows progress by going to rehab." Dodd arranged a follow-up meeting with Mother and Father in December 2022. Dodd testified that at that time, Mother had not found stable housing, still lived with Father and Father's mother, and had just tested positive for alcohol, even though she denied drinking. In 2023, Dodd would "check in with" Mother periodically at a convenience store where Mother had found work, and Dodd asked her if she was still in a relationship with Father. Mother told Dodd that she was, and Dodd counseled Mother against this. Dodd testified that Mother continued to associate with Father, even after he went to jail.

Laura Sears, the Department caseworker assigned to the case beginning in December 2023 and continuing through trial, confirmed that Mother tested positive for alcohol in January 2024, and Sears had seen nothing to indicate that Mother had attended any AA or NA meetings during her time on the case. Sears also testified that she had received a "work schedule" from Mother showing hours that Mother had worked in October 2023 but no proof of income. Since taking over the case, Sears had supervised nine visits between Mother and Beth, and she testified that the visits went "well," with Mother being on time for the visits and Beth appearing bonded to Mother and happy to see her.

During the case, Mother completed a psychological evaluation, a copy of which was admitted into evidence. The evaluation was performed by Dr. James Shinder, who testified that during the evaluation, Mother "was questioned at length about medical, physical, emotional, previously diagnosed conditions, and in each instance, she negated having any problems of that nature, but presented herself as a disabled veteran who is receiving disability [benefits] . . . following a couple of months in the Army." Mother reported to Shinder that she received approximately $5,000 per month in disability payments and other government benefits. Mother also acknowledged

18

her drug history, telling Shinder that she used cocaine daily when she was twenty years old but was drug-free for approximately seventeen years after that, when she began using methamphetamine. Mother presented herself as an "ideal parent who has provided good care for her children" and who had "no worries" in her life, which led Shinder to believe that Mother "was not being forthright" with him. Based on Mother's history, Shinder diagnosed Mother with alcoholism and believed that when she took prescription narcotics, she was simply substituting one substance for another.

Shinder concluded that Mother "underestimates or denies or minimizes, or whatever terms you wish to use, but she doesn't accept the seriousness of her own difficulties and how these difficulties would interfere with the ability to parent." Shinder added that Mother "was highly insistent that CPS intervention was neither legitimate, warranted, or beneficial." Given Mother's beliefs, Shinder was pessimistic that Mother had the ability to change. He explained, "When a person views themselves as perfection, they have no motivation to change. She presented herself as an ideal person, as a capable, confident and responsible parent. None of those things would, in her viewpoint, necessitate change." In Shinder's view, Mother "doesn't have the ability to connect, bond, and commit herself on a long-term basis to parenting."

Mother testified that she has been working at a convenience store since December 2022, makes $13.00 an hour, and works approximately 40 hours per week. Additionally, Mother receives disability benefits from the VA in the amount of approximately $1,200 per month and has health insurance that covers Beth. Mother denied that she receives income of $5,000 per month.

Regarding her living situation, Mother testified that since October 2023, she has been living at an RV park in an RV that she rents for $850 per month. A copy of the lease was admitted into evidence. Mother currently lives with Father's mother, who suffers from dementia and Alzheimer's. Before living in the RV, Mother stayed at a motel in Rockdale for approximately four

19

or five months, lived with a family friend for several months, and lived for a week or two with a man who she later learned was a sex offender. After learning that, she moved out.

Regarding her court-ordered services, Mother recounted that she is in the process of taking parenting classes, that her visits with Beth had never been stopped for a failed drug test, and that she never missed a visit with Beth except for one time when she was sick and had to reschedule the visit. Mother testified that she has taken four or five drug tests since August 2023 and that none of those tests were positive for illegal drugs, although she acknowledged testing positive for alcohol in January 2024. Mother also testified that her visits were suspended when she tested positive for alcohol. Regarding her positive tests for opiates, Mother recounted that she takes prescription painkillers for lower back pain and other issues. Mother denied taking anything to dilute her drug-test results, stated that the last time she used illegal drugs was "probably three and a half years ago," and denied that she had a problem with alcohol. She testified, "I have never had a problem with alcohol. If I don't want it, I don't drink. If I do, I have a couple. And it is not all the time." However, Mother acknowledged that she was aware that she was not supposed to be drinking alcohol during the case but that she drank occasionally anyway, jeopardizing Beth's return.

Regarding Father, Mother testified that she did not know that he had been drinking on the day that he was arrested for DWI. Mother also testified that she has not been in a relationship with Father since August 2023, and she denied having any contact with him in jail, although she acknowledged that Father had tried to call her from jail.

Two other witnesses testified briefly on Mother's behalf: Cynthia Carol, the adoptive mother of Mother's son D.J., and Tina Carol (no relation), Mother's supervisor at the convenience store where Mother worked. Cynthia testified that her relationship with Mother was "really good" and that she believed Mother had "made a lot of progress" in her life by holding a full-time job, owning her own vehicle, and finding housing. Cynthia had concerns regarding Mother's drug use in

the past but no longer had those concerns, although she acknowledged that Mother "drinks occasionally." Tina testified that Mother was a "good employee," did not miss work often, and had no issues with other employees.

During the case, Beth had been placed with Foster Father and Foster Mother, both of whom testified at trial. Foster Father testified that he and Foster Mother had been married for almost twenty years, that he was a petroleum engineer who earned approximately $300,000 per year, and that they have six children, including Beth and one other foster child, ranging in age from two to sixteen. Beth had been placed in their home for almost two years and was "doing great" there. She was bonded with both Foster Father and Foster Mother, who she called "Poppy" and "Cookie." Foster Father testified that Beth also had a "great" relationship with their other children and was considered "the princess of the house," receiving a lot of love and attention from her siblings. Beth shared a room with the other foster child, who was three years old, and the parents had child-proofed the house "six ways past Sunday because we have a two-year-old and a three-year-old [who] want to get into everything." Foster Father explained that their house was regularly checked by CPS, that they go through monthly and annual training with their fostering agency, that they teach parenting skills at their church, and that they attend a foster and adoption conference every year. Foster Father further testified that they are committed to keeping Beth in their home, wanted to adopt her if Mother's parental rights were terminated, and were already planning on enrolling Beth in swimming lessons.

Foster Mother has a master's degree in public health and currently stays home with the children. She testified that Beth "was a light in our house from the beginning," that the other children adjusted "immediately" to her, and that Beth and the other children have "mutual adoration" for each other. Foster Mother also testified that Beth bonded well with Foster Father, describing him as the "apple of [Beth's] eye." Foster Mother explained that Beth is "very adaptable" and "very

21

easygoing." She elaborated, "She has always been very happy and very laid back. Right now, we are in toddler full force so just emotionally helping her work through frustrations and feelings and emotions, but nothing out of the ordinary for sure." Foster Mother described Beth as a "very healthy kiddo" who had hit all her developmental milestones, either on time or early. Foster Mother testified that if Mother's parental rights were terminated, they would move forward with adoption of Beth. Foster Mother further testified that she had transported Beth to visits with Mother, that Beth was excited to see Mother and happy to go home with Foster Mother, and that Mother provided items to Beth during the case, including diapers, toys, and clothing.

Caseworker Torrey testified that she visited Beth monthly in the foster placement and that she had observed that Beth and the foster family were "very bonded." Torrey recounted that Foster Mother was "very active with [Beth]. She has, from what I have seen, a philosophy of letting her explore her world but making sure she is safe both emotionally and physically and guiding her along so that she can have fun and do things and learn new things but still be safe." She added that Beth has "really blossomed in their home" and was "well-developed emotionally and physically," which Torrey attributed to "a loving family."

*Analysis*

The evidence supporting the finding that termination of Mother's parental rights was in Beth's best interest includes the following:

- Mother's admission that she waited until August 2023 to end her relationship with Father, who had a history of methamphetamine use and was arrested for DWI with Beth inside the vehicle, even though Mother was told by both Department caseworker Torrey and CPS family group decision-making specialist Dodd that she should end the relationship to obtain Beth's return;

- Torrey's testimony that Mother "clearly has a long history of . . . very

22

poor judgment," particularly regarding Father, who Torrey described as "dangerous, especially to children," and Torrey's and Dodd's testimony that Mother continued to have contact with Father while the case was ongoing, including while he was in jail;

- Torrey's testimony regarding Mother's drug tests, which showed that although Mother had "a lot of negative drug tests," she also tested positive for alcohol on multiple occasions, had "a lot of tests that she failed to attend," and had "some dilute negative drug testing," which occurs when someone "tries to flush their system with excess amounts of water or other things you can buy on the market to cleanse them of drugs and alcohol." The tests Mother failed to take and the dilute negative tests counted as positive tests;

- Torrey's testimony that Mother attended only three AA meetings during the case, even though she should have attended approximately 75 meetings. Although Mother denied having a problem with alcohol, Torrey explained that Mother's need to attend AA was based on "her past ten or twelve years of alcohol and drug abuse. She can maintain sobriety for a short period of time and then she falls off the wagon." Mother acknowledged that she was required to refrain from drinking alcohol during the case but drank alcohol occasionally anyway, jeopardizing Beth's return to her;

- Torrey's testimony that Mother had not completed all of her court-ordered services, including parenting classes;

- Dr. Shinder's testimony tending to show that Mother was dishonest, did not have the ability to change her behavior, and "doesn't have the ability to connect, bond, and commit herself on a long term basis to parenting";

- The testimony of the foster parents that Beth is in a loving and stable home where her needs are being met and she is hitting her developmental milestones, that she is bonded to the foster parents and their other children and they are bonded to her; and that they are planning to adopt Beth if Mother's parental rights are terminated; and

23

- Torrey's testimony that Beth and the foster family were "very bonded," that Beth has "really blossomed in their home," and that Beth was "well-developed emotionally and physically," which Torrey attributed to "a loving family."

Viewing the totality of this and other evidence summarized above in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Mother's parental rights was in the best interest of the child. Accordingly, the evidence is legally sufficient to support the best-interest finding.

The evidence contrary to the finding includes the following:

- Foster Mother's testimony that Beth was excited to see Mother during their visits and that Mother provided items for Beth during the case, including diapers, toys, and clothing;

- Caseworker Sears's testimony that she had supervised nine visits between Mother and Beth and that the visits went "well," with Mother being on time for the visits and Beth appearing bonded to Mother and happy to see her;

- Mother's testimony that she had a job since December 2022 and a home of her own since October 2023, that she was no longer in a relationship with Father, that she was in the process of taking parenting classes, that her visits with Beth had never been stopped for using illegal drugs, that she never missed a visit with Beth except for one time when she was sick and had to reschedule the visit; and that she had been free of illegal drugs for "probably three and a half years";

- D.J.'s adopted mother's testimony that she believed Mother had "made a lot of progress" in her life by holding a full-time job and finding housing, and that she no longer had concerns about Mother's drug use; and

- The testimony of Mother's supervisor that Mother was a "good employee," did not miss work often, and had no issues with other employees.

24

We are unable to say that this and other evidence contrary to the finding is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Mother's parental rights was in the best interest of Beth. Accordingly, we conclude that the evidence is also factually sufficient to support the best-interest finding.

We overrule Mother's second issue.

## CONCLUSION

We affirm the order of termination.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed: July 31, 2024